## 66862. RIDGLEY v. HELMS et al.

QUILLIAN, Presiding Judge.

Sheryl Lynn Ridgley, brings this appeal from the final order of adoption of her minor child by appellees. Sheryl is the unmarried, natural mother of a female baby born to her on September 21, 1982. She was fifteen years of age at that time. During the sixth or seventh month of her pregnancy she first thought of letting someone adopt the child. Her parents were of the opinion she should place the child for adoption. A call to the Edgewood Baptist Church was received by Mrs. Roland about placing the child. Mrs. Roland made the necessary arrangements and discussed the adoption with Sheryl and her mother. Sheryl entered the hospital early because of complications —

on September 20th. Her doctor made a diagnosis of "preeclampsia, elevated blood pressure . . ." The following morning Sheryl had "a seizure [grand mal] which changed the diagnosis from preeclampsia to eclampsia." (Eclampsia: convulsions and coma occurring in a pregnant woman, associated with hypertension. Dorland's Medical Dictionary.) She was treated, on the morning of September 21st, with "sedatives which included sodium luminal and magnesium sulfate." Sodium luminal is a barbiturate, a sedative, a hypnotic drug, commonly called phenobarbital. Magnesium sulfate is used to control irritability of the nervous system. Both drugs are used to control seizure activities. Sheryl gave birth to her daughter around 4:20 p.m. the afternoon of September 21st. That evening around 10:00 p.m. and every six hours thereafter she received another dose of those medications.

The following morning, September 22nd, the attorney representing the adoptive parents, and Ms. King, a medical social worker in the hospital, went to Sheryl's room for the purpose of having her sign the consent to adoption papers. Sheryl was sleeping. She was awakened and they spoke to her for a few minutes. Ms. King testified that Sheryl "assured us that she was awake and we agreed that we felt that she was. You [the lawyer for the Helms] went through three different forms and she signed for you and read them. You read from your copy while she went over the copy she had in her hand. And [sic] received the signatures for those forms and then I went over the short form that I had for her to sign. After the signature we both asked her if there were any questions and she indicated that she understood the proceedings and that she had no questions at that time." Ms. King was of the opinion that Sheryl was alert, and her responses to the questions were prompt and appropriate.

Dr. Flanagan, Sheryl's doctor, testified he was aware that the baby was up for adoption and "the mother was also aware the baby was for adoption . . ." After she had the seizure and had received medication for it, he spoke with her that night. She knew what was going on. He saw her the morning after she had given birth in her room, around seven o'clock. She was awake, "somewhat sedated but alert . . ." He was asked: "Q. Would you say that she was able to carry on a conversation other than being sleepy, so to speak? A. Yes." When she left the hospital on the 24th, Sheryl was "mentally sound and normal."

Sheryl testified that the day that she went home from the hospital her mother reminded her that she had 10 days to revoke her consent to the surrender of her child for adoption. She said she changed her mind the first week she was home but only called Mrs. Roland and asked her if she wanted her baby back "it would hurt

them [the adoptive parents], wouldn't it?" Mrs. Roland said, "yes, it would probably kill them." Sheryl took no action to revoke the consent in writing until the petition for adoption was filed. She filed an objection to the petition. Sheryl testified that she had a learning disability and needed glasses to read. She did not have her glasses with her in the hospital when she signed the consent to adoption. When things are read to her it is necessary for them to be repeated for her to understand them, even though she has a normal IQ. This was confirmed by her teacher in high school. The judge asked Sheryl to read aloud that portion of the consent to adoption concerning the withdrawal of consent only by written notice within ten days. After she had read it to the court, he asked her what she had read. Sheryl stated: "That after ten days I couldn't change my mind."

Following a hearing on Sheryl's objection to the adoption, the trial court found that Sheryl was aware of what she was doing at the time that she had signed papers releasing her child for adoption, and that her doctor had found Sheryl, on the morning she signed the papers, "somewhat sedated but alert . . . and able to carry on a normal conversation and was otherwise fully functioning." He observed that Mrs. Roland spoke with Sheryl on the morning of the 22nd and visited her that afternoon, and on both occasions found Sheryl "alert, responsive and able to engage in normal conversation." The court found that Sheryl knew before she went to the hospital, during her stay in the hospital, and after she left the hospital that she was going to release her child for adoption. He found that she did not rescind or revoke her election to surrender her child for adoption within ten days following the signing. The court concluded, based upon his observation of Sheryl during her testimony, that she was capable of understanding, and did understand the nature and importance of the documents she executed, and that she had ten days to withdraw her consent. He found that although she was sedated at the time of execution, she had known for several months prior to the birth of the child that the child was to be placed for adoption. She recognized the adoptive parents' attorney, knew she signed papers releasing her child for adoption, and had ten days to withdraw her consent but failed to do so. He concluded that Sheryl voluntarily and knowingly signed the consent documents, was furnished with notarized copies, and was reminded by her mother upon her return home that she had ten days to change her mind. She did not revoke her consent within the ten-day period although she testified that she did change her mind during that period. The court concluded that the objector had failed to show cause why the adoption should not proceed. Sheryl Ridgley brings this appeal. *Held:*

1. The appellant asserts that the trial court erred in finding that

consent was freely and voluntarily given. We do not agree. The trial court sat as the finder of fact and gave its reasoning in its order for finding that the mother, although sedated, had been seen earlier by her doctor, talked to Mrs. Roland on the morning she signed the papers, and Ms. King, the social worker at the hospital — and all found that she was alert and capable of carrying on a normal conversation. The trial court's ruling is supported by the evidence and unless it is clearly erroneous an appellate court is not authorized to set it aside. OCGA § 9-11-52 (a) (Code Ann. § 81A-152). We cannot say, as a matter of law, that the finding of the trial court that the mother's consent was freely and voluntarily given is clearly erroneous. *Ritchie v. Dillon,* 103 Ga. App. 7 (2) (118 SE2d 115); *McCall v. VanPopering,* 124 Ga. App. 149 (1) (183 SE2d 411); *McGowan v. Wilkinson,* 145 Ga. App. 691 (1) (244 SE2d 626).

2. The third enumeration of error alleges "[t]he trial court erred as a matter of law in holding that it was without power to allow the objections of the natural mother because the ten day revocation period had passed without any written withdrawal of consent by Sheryl Ridgley." Counsel has failed to furnish us a citation to the record where this ruling may be found and our reading of the record has not revealed such a ruling. In its order, the trial court discussed the facts and concluded as a matter of law that the surrender documents were voluntarily and knowingly signed by the objector. She was furnished with photostatic copies of the executed papers which contained clear and unambiguous language, identical with that found in the statute, that such surrender could only be withdrawn by written notice to the adoptive parents within ten days — which was not done. The court concluded since the documents were knowingly and intelligently executed, she was provided copies, and failed to exercise her right to withdraw her consent within ten days, and the adoptive parents had made out a prima facie case for adoption "and that the Objector has failed to show cause why the adoption should not proceed" — that Sheryl's intervention and objection should be denied.

Under Code Ann. § 74-403 (a) (now OCGA § 19-8-3 (a)), no adoption is permitted except with the written consent of the living parent or parents of a child. Such consent, when given freely and voluntarily may be revoked as a matter of right within ten days after signing the document. OCGA § 19-8-4 (b) (Code Ann. § 74-404). After ten days, although consent may not be withdrawn as a matter of right "it does not preclude such revocation prior to final adoption for good and sufficient cause." *Duncan v. Harden,* 234 Ga. 204, 206 (214 SE2d 890); accord: *Wellfort v. Bowick,* 147 Ga. App. 565 (1) (249 SE2d 363). It is not contested that Sheryl's consent was not withdrawn within

the ten-day period. Thus, there remain only two issues: (1) was the consent freely and voluntarily given, and (2) was good and sufficient cause shown to void such consent if it was voluntarily given. The court found that the consent was freely and voluntarily given and concluded, as a matter of law "that the Objector has failed to show cause why the adoption should not proceed . . ." This is an affirmative finding that the objector, Sheryl Ridgley, had failed to show any cause — good or sufficient, as to why she should not be held to her original consent and failure to withdraw it within the statutory period. We find no merit in this enumeration.

3. Appellant argues that the court erred "in not considering the report of the Department of Family and Children Services even though this consideration is mandated by statute." The trial court stated that he had received the report and "did not read it in detail. I only read her recommendation." He correctly cited the report's recommendation and then stated to both counsel: "I'll be glad to let you gentlemen examine it in its entirety. The Court will scan it."

We agree with counsel that it is mandatory for the trial court to consider the investigative report and the recommendations contained therein. *Chandler v. Cochran,* 247 Ga. 184, 185 (275 SE2d 23). However, the trial court did consider the report's recommendations and stated for the record that he would scan the report. We find no violation of OCGA § 19-8-13 (a) (1) (Code Ann. § 74-412) which requires that the trial court shall give consideration to the investigation report and the recommendations contained therein. *Wellfort v. Bowick,* 147 Ga. App. 565 (3), supra.

*Judgment affirmed. Sognier and Pope, JJ., concur.*

Decided September 21, 1983 —
Rehearing denied October 17, 1983 — 

*William C. Rumer, Lee R. Grogan, Jr.,* for appellant.
*Samuel W. Oates, Jr.,* for appellees.